**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 05-cv-01015-LTB-BNB

QWEST COMMUNICATIONS INTERNATIONAL, INC., a Delaware corporation,

        Plaintiff,

vs.

EOP HOLDINGS LLC dba ENQWEST, a Delaware limited liability company,

        Defendant.

_____

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER**
_____

**INTRODUCTION**

        This case involves Qwest Communications International Inc. ("Plaintiff" or "Qwest") who has brought suit against defendant EPO Holdings LLC, which does business as EnQwest ("Defendant" or "EnQwest") for use of Qwest's famous marks in connection with offering and providing group purchasing services in connection with its customers' purchases of a wide range of goods and services, including technology and communications services.  The Court now issues the following Findings of Fact and Conclusions of Law and Order.

**FINDINGS OF FACT**

        1.     Qwest is a well-known company that provides diversified communications goods and services to businesses and residential consumers and to intermediary businesses that redistribute Qwest's goods and services to end-users.  These goods and services are widely offered to the public under the "QWEST" marks.

        2.     Qwest is among the largest providers of communications goods and services to businesses and residential consumers.  Qwest is a recognized leader in its industry.

3.     Qwest, its licensees, and its predecessors-in-interest have provided and continue to provide a diverse array of communications products and services, including without limitation internet services, voice, data and message transmission services, ISP services, intranet services, extranet services, network management and security services, digital fiber network services, broadband multimedia services, digital television services, design of data information networks, computer programs, wireless telecommunications services, installation and maintenance of electronic data and information networks, frame relay services, ISDN services, local and long distance telephone services, prepaid phone cards and calling cards, switched digital services, credit cards and credit card services, telephones and telephone accessories, wireless handsets and accessories, modems, routers, and other hardware necessary for the transmission of voice and data over a communications network. Qwest and its predecessors-in-interest have provided (and continue to provide) these goods and services to a broad cross-section of individuals, small businesses, large businesses, and global enterprises.

4.     Qwest does not solely provide communications goods and services. The goods and services offered under the QWEST brand have expanded outside of the communications field, including by way of example only, sporting and entertainment services, sporting paraphernalia, periodic publications, billing and account services, portal services, charitable services, retail store services, and facility services. Qwest has applied for (and obtained in many cases) numerous trademark registrations for QWEST covering such varied uses. (The totality of goods and services provided by Qwest under all of the Qwest marks are referred to as the "Qwest Goods and Services.")

5.     Qwest has provided at least some of the Qwest Goods and Services in commerce since at least as early as 1981. Qwest obtained common law rights to the various QWEST marks as of that date, and has maintained its common law rights by virtue of its continuous use of those marks in commerce in connection with the goods and services described above.

6. In addition Qwest has obtained numerous federal trademark and service mark registrations for marks consisting of or incorporating the coined term "Qwest," including but not limited to the following marks (collectively, the "QWEST Marks").

    a. Qwest owns United States Trademark Registration No. 1,966,694 for the mark QWEST for use in connection with "telecommunication services, namely the electronic transmission of voice, data and messages."

    b. Qwest owns United States Trademark Registration No. 2,210,992 for the mark QWEST (Stylized) for use in connection with "telecommunication services, namely long distance telephone services and electronic transmission of voice, data and messages."

    c. Qwest owns United States Trademark Registration No. 1,979,485 for the mark QWEST COMMUNICATIONS for use in connection with "telecommunication services, namely the electronic transmission of voice, data and messages."

    d. Qwest owns United States Trademark Registration No. 2,841,534 for the mark QWEST SELECT SOLUTIONS for use in connection with "computer consultation and management services, namely web site creation and hosting; monitoring computer network firewalls, servers and other network devices to prevent unauthorized access; computer database development services, computer system management."

    e. Qwest owns United States Trademark Registration No. 2,791,930 for the mark QWEST CHOICE ONLINE for use in connection with "providing customized online web pages featuring user-defined information which includes search engines and online web links to other web sites; access provider services, namely, providing multiple-user access to a global communications information network;

      providing customized online web pages featuring user-defined information which includes search engines and online web links to other web sites."

f. Qwest owns United States Trademark Registration No. 2,925,528 for the mark BROADBAND BY QWEST for use in connection with " Providing temporary use of on-line non-downloadable software; computer consulting services in the field of conducting and managing daily business procedure; computer services, namely the designing, maintaining and hosting of software application for others; providing data storage and warehousing of client information on computer servers accessible via a global computer information network."

g. Qwest owns United States Trademark Registration No. 2,779,552 for the mark QWEST for use in connection with "telephone calling card services."

h. Qwest owns United States Trademark Registration No. 2,769,596 for the mark QWEST CHOICE ONLINE for use in connection with "information services, namely, providing information on a wide range of topics of general interest to the public via an interactive computer network."

i. Qwest owns United States Trademark Registration No. 2,727,556 for the mark QWEST for use in connection with "computer software, namely electronic mail software for sending, receiving and managing electronic mail messages."

j. Qwest owns United States Trademark Registration No. 2,632,746 for the mark QWEST CHOICE ONLINE for use in connection with "telecommunications services, namely, interactive switched digital and analog communication; telephone, image and information transmission over a telecommunications network."

    k. Qwest owns United States Trademark Registration No. 2,669,737 for the mark QWEST for use in connection with "on-line retail distributorship services for wireless communications equipment and accessories."

    l. Qwest owns United States Trademark Registration No. 2,628,931 for the mark QWEST for use in connection with "published telephone directories."

    m. Qwest owns United States Trademark Registration No. 2,810,883 for the mark QWEST LINK for use in connection with "telecommunications services, namely, electronic transmission of voice, video, messages and data; providing access to a fiber-optic telecommunications network; providing multiple user access to a global computer network; local computer network, featuring mobile access; broadcasting programs via a global computer network; and video teleconferencing services."

    n. Qwest owns United States Trademark Registration No. 2,513,382 for the mark QWEST for use in connection with "telephone directory services."

    o. Qwest owns United States Trademark Registration No. 2,528,101 for the mark QWEST CONTROL for use in connection with "providing billing and account information via website."

    p. Qwest owns United States Trademark Registration No. 2,939,701 for the mark Q QWEST CENTER OMAHA for use in connection with "arena services, namely providing facilities for business events, consumer shows, trade shows, artistic activities, community activities, entertainment, public events, sporting events and tournaments, educational events, conventions and exhibitions."

7. The federal trademark registrations listed above (the "QWEST Registrations") constitute *prima facie* evidence of Qwest's exclusive right to use the registered trademarks in commerce and of the validity and ownership of these marks. Qwest is entitled to constructive use

rights, including nationwide priority rights, as of the filing dates of the applications that matured into the QWEST Registrations.

8. The coined term "QWEST" is neither an English word nor a translation of a foreign word.

9. Qwest has expended several hundred million dollars advertising and marketing the Qwest Goods and Services under the fanciful QWEST Marks and establishing the QWEST Marks as indicators of source, origin, and quality.

10. QWEST is a national brand, used on a wide range of services and products. The QWEST Marks have been continuously advertised and promoted in all 50 states, as well as throughout the world, and have been widely advertised in various regional and national sources, including print, on the Internet, and in radio and television media, all directed to the consumer marketplace for communications goods and services generally, and the market for the Qwest Goods and Services in particular.

11. The QWEST Marks and the Qwest Goods and Services are recognized among the consuming public as being uniquely identified with Qwest and no other entity. As a result of Qwest's extensive use and promotion of the QWEST Marks, the QWEST Marks have gained considerable commercial strength, strong public recognition, and are famous.

12. Qwest has earned billions of dollars in revenue as a result of its sale of the Qwest Goods and Services under the QWEST Marks.

13. Defendant EPO Holdings LLC is a Delaware limited liability company, which does business as EnQwest. EnQwest is engaged in the business of collective purchasing and contract services. EnQwest has partnered with several companies in order to provide to its customers a variety of goods and services, including equipment leasing, human resources, risk financing, and communications services.

14. In 2001, Defendant adopted and is using ENQWEST as a trade name, a domain name, trademark, and service mark (the "EnQwest Mark") in connection with its goods and services. Defendant also has registered the internet domain name and owns a web site located at <*www.enqwest.com*> and uses that web site to advertise and promote its goods and services on the internet.

15. The EnQwest Mark includes the coined term "Qwest," which is identical to plaintiff's mark.

16. A portion of the services that EnQwest advertises and sells are identical or highly related to some of the goods and services offered by Qwest under the QWEST Marks. Other services advertised and sold by EnQwest are unrelated to the Qwest Goods and Services.

17. EnQwest uses the EnQwest Mark in some of the same channels of trade as Qwest uses the QWEST Marks.

18. EnQwest's first commercial use of the EnQwest Mark occurred many years after Qwest's first use of the QWEST Marks.

## CONCLUSIONS OF LAW

19. Qwest has had common law ownership and exclusive right to use QWEST as a mark since 1981. In addition, the federal registrations of the QWEST Marks establish a *prima facie* case of Qwest's ownership and validity of these marks, as well as the exclusive right to use the QWEST Marks in the provision of telecommunications services and products. 15 U.S.C. § 1115(a).

20. The term QWEST is a coined term first used by plaintiff. As a coined term, the mark is considered inherently distinctive. Moreover, due to the lengthy and extensive promotion by plaintiff of goods and services under the QWEST Marks, the QWEST Marks are famous among the general purchasing public and within the relevant channels of trade. Given both the

commercial and inherent strength of the QWEST Marks, they are strong marks entitled to the broadest scope of protection.

21.     "The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to--

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."

15 U.S.C. § 1125(c)(1).

22.     In view of the inherent distinctiveness and great strength of the QWEST Marks, their duration and extensive use and promotion, their geographical extent of use and channels of trade, the wide recognition of the QWEST Marks among the consuming public, and the fact that the QWEST Marks are registered on the Principal Register in the United States Patent and Trademark Office, this Court is convinced that the QWEST Marks are famous and entitled to protection from dilution under the Federal Trademark Dilution Act.

23. "The term 'dilution' means the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of -- (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127.

24. The EnQwest Mark is identical to the QWEST Mark in its use of the coined term "Qwest." As such, a dominant term and distinctive portion of the EnQwest Mark is the QWEST term.

25. The Supreme Court has held that trademark dilution may be inferred from the identity of the parties' marks. *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 434 (2003). The addition of the term "En" does not diminish the fact that defendant's mark appropriates and is identical to the entirety of plaintiff's coined term "Qwest." The Court concludes that defendant's use of the EnQwest Mark lessens the capacity of the QWEST Mark "to identify and distinguish the goods and services" of plaintiff. Therefore, defendant's use of the EnQwest Mark comprises trademark dilution in violation of 15 U.S.C. § 1125(c).

26. Under the dilution statute, the presence or absence of competition between the parties or the presence or absence of likelihood of confusion, mistake or deception is not relevant. The statute also contains certain safe harbors for defendant, none of which are applicable in this case.

27. Due to the strength of the QWEST Marks, any use in commerce of a mark confusingly similar to QWEST -- including EnQwest or other QWEST or QUEST derivative marks -- in connection with any goods or services related to a broad range of consumer communication goods and services, including Internet, ISP, communications software, business and consumer telecommunications services, or telecommunications hardware, is likely to cause confusion.

28.     The Tenth Circuit has developed a non-exclusive list of factors to guide the determination of likelihood of confusion:

> (a) the degree of similarity between the designation and the trade-mark or trade name in
>
>> (i) appearance;
>>
>> (ii) pronunciation of the words used;
>>
>> (iii) verbal translation of the pictures or designs involved;
>>
>> (iv) suggestion;
>
> (b) the intent of the actor in adopting the designation;
>
> (c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other; and
>
> (d) the degree of care likely to be exercised by purchasers.

*Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir.1986).

29.     Similarities between marks are more relevant than differences, particularly when the marks are used on similar products. *Id*.

30.     Qwest's mark is "Qwest". Defendant's EnQwest Mark includes the term "En" in front of "Qwest." Infringement is not avoided merely by adding a term to an existing mark. The law does not permit such minor variations. It is long settled and well known that confusion created by adoption of the senior user's mark is not eliminated by the addition of a descriptive term. See, e.g., *Miss Universe, Inc. v. Patricelli*, 408 F.2d 506, (2d Cir. 1969) ("Miss U.S.A." and "Miss U.S.A., World"); *Gucci Shops v. R.H. Macy & Co.*, 446 F.Supp. 838 (S.D.N.Y. 1977) ("Gucci" and "Gucci-Goo").

31.     The marks are thus similar in appearance, pronunciation, verbal translation, and suggestion. Members of the consuming public would readily assume that certain of the EnQwest services, in particular, those relating to the telecommunications industry, are authorized,

sponsored and/or originated by Qwest itself.  This heavily weighs in favor of a finding that the marks are highly similar if not virtually identical.

32. The next factor (intent of the actor) also supports a finding of likelihood of confusion.  This is presumed where one " adopts a mark similar to another already established in the marketplace."  *Beer Nuts*, 805 F.2d at 927 (internal quotes and citations omitted).  Qwest's federal registrations provide EnQwest with constructive notice of Qwest's trademarks rights.  (See 15 U.S.C. § 1072 "Registration of a mark on the principal register . . . shall be constructive notice of the registrant's claim of ownership thereof.")

33. Moreover, to the extent that EnQwest's goods and services could be considered not sufficiently similar or related, Qwest nevertheless is entitled to preclude EnQwest from using the mark if consumers "might reasonably expect" Qwest to expand its business into the goods and services provided by EnQwest.  The Lanham Act "aims to protect the trademark owner's interest in capitalizing on the good will associated with its mark by moving into new markets."  *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 681 (7th Cir. 2001).  This "zone of natural expansion" doctrine grants the trademark owner protection against other services "as might naturally or reasonably be supposed to come from him."  *Helene Curtis Indus., Inc. v. Charles & Dwight Co.*, 560 F.2d 1325, 1331 (7th Cir. 1977); *see also Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 463 (7th Cir. 2000) ("dietary supplements are an area of natural expansion for pharmaceutical companies," so similarity of the mark between plaintiff's drug and defendant's herbal supplement supported a likelihood of confusion).

34. The third factor (marketing of the goods and services) also weighs heavily in favor of confusion.  Both parties use, among other sales channels, the Internet.  "[T]he simultaneous use of the Web as a marketing channel" is a critical issue in determining likelihood of confusion. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (internal quotations and citation omitted).  Qwest promotes the Qwest services and products through the Internet by use

of web sites accessible at <*www.qwest.com*> and <*www.qwest.net*> and also through local and regional media.  Defendant promotes its proposed services on the Internet using its website accessible at <*www.enqwest.com*>.  EnQwest is thus in the same channels of trade as Qwest.

35.     The last factor in the analysis is the standard of care likely to be used by relevant consumers, considering the care exercised by the "least sophisticated consumer."  *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3rd Cir. 1991).  The parties' goods and services and their marketing channels are a part of everyday life in America, reaching almost every consumer.  See *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1044 (9th Cir. 1999).  Given the similarity of the EnQwest Mark to the QWEST Marks, the least sophisticated consumer could believe that EnQwest's services originated from or are sponsored by plaintiff Qwest.

36.     EnQwest's use of the EnQwest Mark is likely to cause confusion, deception and mistake among members of the unwary purchasing public.

37.      Any findings of fact which are deemed to be conclusions of law are incorporated herein by reference.

**ORDER**

It is hereby ORDERED, ADJUDGED AND DECREED:

1.     Subject to a reasonable phase out period that expires on October, 31, 2005, this Court hereby issues a permanent injunction after said phase out period against EnQwest and each of its agents, employees, servants, officers, directors, successors in interest, heirs, assigns and all persons, firms or corporations, acting by or under their authority, in active concert or privity or in participation with them from diluting or infringing upon the QWEST Marks and/or using the QWEST Marks or any mark confusingly similar to QWEST -- including ENQWEST, ENQUEST or other QWEST or QUEST derivative mark -- in any way, or using any other word, words, phrases, symbols, domain names, logos, which would create a likelihood of confusion, mistake or

deception in connection with or in the marketing, offering, selling, disposing of, licensing, leasing, transferring, displaying, advertising, reproducing, developing or manufacturing of their business, services and products.

2. Defendant is ordered to cancel or transfer to Qwest its <enqwest.com> domain name by not later than February 28, 2006. In the interim between October, 31, 2005 and February 28, 2006, Defendant may use this domain name in a temporary manner, i.e., solely to refer visitors to this domain name to a new domain name complying with paragraph 1 of this injunction.

3. Defendant waives any objection under Federal Rules of Civil Procedure 65(d) (pertaining to injunctions) to paragraphs 1 and 2 above.

4. Each party shall bear its own fees and costs.

5. Judgment is accordingly entered in favor of Plaintiff. The Court shall retain jurisdiction to enforce this Order and Judgment.

**IT IS SO ORDERED**.

DATED this   21st   day of October, 2005.

    s/Lewis T. Babcock

    The Honorable Lewis T. Babcock
    United States District Judge